(No. 823—Claimant awarded $5,660.00.)

MODERN SYSTEMS CONSTRUCTION AND SUPPLY COMPANY, Claimant, *vs.* STATE OF ILLINOIS, Respondent.

*Opinion filed September 14, 1926.*

CONTRACT—*when State liable for work and material.* The State is liable for work performed and material furnished, under contract with claimant, on its State building where the contract is performed according to the plans and specifications proposed by the Division of Architecture of the Department of Public Works and Buildings.

SAME—*when the State is not liable.* The State is not liable for extra work performed, where it is performed without extra cost to the contractor.

SAME—*State not liable for interest on invested capital.* The State is not liable for interest on invested capital and equipment, as such interest is speculative in character.

SAME—*when not liable for loss to contractor.* The State is not liable for losses due to insufficiency of labor caused by interference with job organizations.

SMALL, BRATTON & SCHROEDER, for claimant.

OSCAR E. CARLSTROM, Attorney General; ROY D. JOHNSON, Asst. Attorney General, for respondent.

MR. JUSTICE THOMAS delivered the opinion of the court:

On June 15, 1921, the Modern Systems Construction and Supply Company, claimant herein, entered into a contract with the State of Illinois whereby it agreed to provide all the materials and to perform all work for the general work of buildings for the Alton State Hospital at Alton, Illinois, for $326,583.00. The work was to be done according to the drawings, plans and specifications therefor prepared by the Division of Architecture of the Department of Public Works and Buildings, and was to be substantially completed by March 1, 1922. The contract fixed the prices of labor and materials upon which the total contract price was based and bound the contractor in no event to pay more than 65 cents per hour for hod carriers and mortar mixers, 62½ cents for other common labor and $1 per hour for brick masons, stone masons, iron workers, lathers, sheetmetal workers, carpenters, painters and plasterers, and provided that the net savings effected should be deducted from the contract price. Under the terms of the contract the time of completion of the work might be extended by the supervising architect, and it was extended by him 60 days.

Two other contracts were entered into between claimant and the State, the first on October 25, 1921, for the installation of bell traps and drain pipes for which claimant was to receive $2000.00, and the second on November 5, 1921, for certain substituted materials for which claimant was to receive $1400.00.

On December 9, 1921, the State let the contract for the general plumbing work of the entire building to E. Baggott & Co. In the latter part of March, 1922, the plumbers went on a strike. In October of that year E. Baggott & Co. gave up their contract and the State took over the plumbing work and later finished it.

Claimant contends that the failure to have the plumbing done in proper time compelled claimant to delay its work and that during such delay the prices of materials and labor increased, its machinery and fixtures were idle, its organization disrupted and its money tied up, etc., for which it has filed this suit. Attached to its declaration are 22 separate claims or "invoices" aggregating the sum of $40,144.53 which claimant contends the State owes it. This amount includes certain items mentioned in the invoices for extra work and material furnished by claimant and for which it had no written contract with the State.

The Attorney General filed a general demurrer to the declaration. After this demurrer was filed it was stipulated by the parties that invoices 1, 4, 5, 6, 7, 8, 9, 10 and 15 and also an item of $379.46, which was not paid on final certificate because of lack of funds, are correct and should be allowed. The total amount of this item and invoices, which the Attorney General agrees is a just claim against the State, is $4,371.26. This stipulation of the Attorney General is an admission that there is some equity in claimant's case, and the demurrer will be overruled and the cause heard as if the general issue had been filed by the State.

In its declaration claimant alleges there was certain other work in and about the buildings of the State at Alton and also extra work done by it for which no written contracts were entered into between it and the State.

Both claimant and the State have taken evidence, including a large number of exhibits, on the question of these verbal agreements. After a careful consideration of all the evidence and exhibits introduced in this case, both on the part of the claimant and of the State, we find that claimant has failed

to prove, by a preponderance of the evidence, the verbal agreements to do such extra work, and the claims for it are refused.

The invoices not included in the stipulation are 2, 3, 11, 12, 13, 14, 16, 17, 18, 19, 20, 21 and 22 and they will be decided in that order.

Invoice No. 2 is a claim for clearing out tunnels and openings left for the plumbers and for bricking up these openings. The specifications require the contractor to leave openings for other trades to do their work and then to close up such openings so that the several parts will properly fit together. The specifications also require the contractor to keep clean all parts of the buildings, and the tunnels are a part of the buildings. While the evidence shows there was an oral-understanding between the claimant and a representative of the State that larger openings were to be left than the plans and specifications called for, yet the evidence does not show this made any difference in the cost. And, as the materials listed and claimed for in this invoice were all necessary to the final completion of the walls, leaving larger openings than were specified would not necessarily add anything to their cost. It was the duty of claimant to clean out the tunnels before its contract was completed, and there is no evidence showing the cost of cleaning out the tunnels was greater than it would have been had the openings been left the size designated in the specifications. If there was a difference in the cost, there is no evidence from which this court can determine the amount. The claim for invoice No. 2 is refused.

Invoice No. 3, is a claim for levelling basement floor after the water line was laid. The evidence shows that the basement floor was in the same condition when the water line was laid that it was when the claimant finished excavating, except the rubbish that had fallen while the building was going up. The specifications required the contractor to do the work mentioned in this invoice if the architect so directed, which he did. This work being required of claimant under its contract, its claim therefor is refused.

Invoice No. 11 is a claim for $10,483.14 for increased cost of plastering. Under its contract with the State all plastering was to be done by claimant. Claimant's contention is, as we understand it, that in February, 1922, it contracted with one Thomas Hawkins to do this plastering for 37 cents per square yard; that Hawkins was ready to begin the job when the

plumbers' strike stopped all work and nothing more was done till the following October when claimant again contracted with Hawkins to do the plastering as a day labor proposition; that claimant kept an accurate account of the work done under this contract with Hawkins and that the plastering cost 96⅔ cents per square yard under it instead of 37 cents, the price for which Hawkins first agreed to do it. The difference between these two prices is the basis of Invoice No. 11. Article 4 of claimant's contract with the State fixes the prices of labor and material upon which the total contract price is based and provides the State shall have the benefit of any savings effected by claimant in securing labor or materials at less than those prices. There is no evidence showing how claimant paid Hawkins, whether by the hour or by the day. If claimant paid him no more per hour for labor than its contract with the State fixes as the basis of the amount to be paid by the State for the entire work, under no theory would the State be liable for any loss sustained by claimant. We are of the opinion that claimant has failed to make any proof upon which the claim for Invoice No. 11 can be allowed and it is therefore refused.

Invoice No. 12 is for storage and extra cost of mill work due to delay on account of the plumbers' strike. The claimant's contract with the State does not provide for the payment of damages or loss occasioned by strikes, and this claim is refused.

Invoice No. 13 is a claim of $5,735.45 for credits made the State for depreciation of labor which claimant contends did not materialize. Under article 4, of its contract, claimant agreed with the State that the labor should not exceed certain prices per hour and that if it secured the labor for a less amount than the prices named in that article, then the State should take credit for the difference between the prices paid by the claimant for labor and the prices named in article 4. From the time it began work under its contract claimant made monthly reports to the State of the amount paid for each class of labor and the State took credit for the amounts shown due it by these reports. There is no evidence in the record showing claimant's reports were not correct or that the credits were not properly given, and the claim for Invoice No. 13 is refused.

Invoice No. 14 is a claim for patching tile floors and mastic base. The original amount claimed was $792.12, which has

been amended to read $1009.47. These floors were put in contrary to the plans and specifications by the Peoria Stone and Marble Works, and without the written consent of Edgar Martin, supervising architect, as provided in article 22 for change in the work. The claimant having failed to comply with the contract, this claim is refused.

Invoice No. 16 is a claim of $1,520.96 for damages to troweled floor finish due to the presence of dirt and lignite in the sand furnished by the State. Claimant's contract provides for certain cement floors, and specifies that immediately after the foundation or structural floor is poured and leveled off a layer or top dressing at least one-half inch thick shall be deposited and worked down with a wood float and where an application of mastic follows shall be finished to a true level by troweling. Claimant put in the floors with a scratch coat finish and, on being told they were not being put down according to the specifications and there would be trouble later when the mastic was applied, replied that it would take care of any trouble that might arise. We are of the opinion this extra cost was caused by claimant's failure to comply with the specifications, and the claim is refused.

Invoice No. 17 is for shrinkage on mas-oleum, amounting to $1007.40. This material was delivered on the job on the 29th of April, 1922, more than 30 days after the plumbers' strike. Claimant knew the strike was on before this material was shipped and it could have stopped the shipment and avoided the loss. Furthermore, there is nothing in claimant's contract with the State making the State liable to the claimant for any change or loss caused by strikes. The State is not liable for this claim, and it is refused.

Invoice No. 18 is a claim for $909.65 for closing windows for plastering in unseasonable weather and cleaning windows after plasterer. Four hundred and sixteen dollars of this claim is for closing of windows in the building on account of unseasonable weather. If claimant had completed the buildings by March 1st, 1922, the time contemplated and fixed for their completion when it signed the contract with the State, the plastering would have been done during the winter months and it would have had to close the window openings (contract, paragraph 183, page 52) to protect the plastering, as the specifications so provide. We are of the opinion that claimant was not put to any additional expense on account of closing of windows. As to the $375.00 for cleaning windows after the plas-

terers, the specifications provide that the contractor shall maintain the building and premises in a neat cleanly condition. The claimant knew this provision was in the contract at the time it was signed and should have included an allowance for this in its bid on the buildings. This claim is therefore refused.

Invoice No. 19 is for $984.50 shrinkage on 100 tons of plaster. Claimant's evidence shows two cars of plaster were received at the job in March, 1922. The freight bills, which are in evidence, show one of the cars contained 90,000 pounds and the other one 110,000 pounds. The Attorney General admits that $440.00 of this claim is just, but contends the cars only contained 25 tons each, and introduced evidence tending to prove that contention. We are of the opinion that the better evidence shows there were 100 tons of the plaster, and that claimant is entitled to an award on that basis. If claimant is entitled to an award of $440.00 on the assumption there were only 50 tons of plaster in the two cars, then it should be awarded $880.00 as the proof shows the cars contained 100 tons. We therefore allow an award of $880.00 on Invoice No. 19.

Invoice No. 20 is for interest on invested capital, reserve fund and equipment, amounting to $1,575.00. The claimant's contract with the State provides that the State shall hold back 15% of the value of the materials and labor, as estimated by the supervising architect, and that the amount held back shall be paid within 30 days after the contract is finished. At the time of the plumbers' strike the reserve belonging to the claimant was in the neighborhood of $38,712.32. It is admitted that about the 1st of July, 1922, an agreement was reached between the claimant and the architect that the claimant was to write a letter to the department requesting that $20,000.00 be paid on his reserve fund. On July 10, 1922, the letter was written and the payment made. In our opinion, interest on invested capital and equipment is speculative. If the claimant had been working during all the time complained of, it might have made interest on its capital and equipment and it might have lost heavily. From the evidence introduced we are of the opinion that the claimant and the representatives of the State had an understanding that upon payment of the $20,000.00 of the reserve fund no claim would be made for interest. The claim for invoice No. 20 is refused.

Invoice No. 21 is a claim for losses due to inefficiency of labor caused by interference with job organization. We cannot see how we would be justified in allowing claimant an award on this invoice. There is nothing in the claimant's contract or the evidence that would justify an award on this claim. Such losses might occur on any contract where a number of different trades are employed, and these facts are taken into consideration by reliable bidders when bidding on contracts of this kind. The claim is refused.

Invoice No. 22 is the balance due on the contract of June 21, 1921, and the extra contracts, 1, 2, 3, and 4, together with the extras acknowledged by the State amounting to $5,413.60. The evidence shows that since March 28, 1924, the date of this invoice, two payments amounting to $4,668.14 have been made, and a credit for paint to the amount of $336.00 has been given, leaving a balance of $409.46 due on this claim. There is no dispute as to this amount, and we therefore award claimant the sum of $409.46 on invoice No. 22.

Claimant is therefore awarded the total sum of $5,660.72.